# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| **M & N MATERIALS, INC.,** | ) |
| **Plaintiff,** | ) |
| vs. | ) |
| | ) Civil Action No. CV-14-S-184-NE |
| **TOWN OF GURLEY, ALABAMA,** *et al.*, | ) |
| **Defendants**. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, M & N Materials, Inc. ("M & N") filed this case on January 31, 2014, asserting claims for unconstitutional taking, arbitrary and capricious due process denial, declaratory judgments under both federal and state law, and an injunction against the following defendants: (1) the Town of Gurley, Alabama ("the Town" or "Gurley"); (2) Vulcan Construction Materials, L.P.; (3) Vulcan Lands, Inc.; and (4) Vulcan Materials Company, Inc.[1]  The case presently is before the court on the Town's motion to dismiss plaintiff's claim for an unconstitutional taking (Count I).[2] Upon consideration of the motion, plaintiff's response,[3] and the Town's reply,[4] the

---

[1] Doc. no. 1 (Complaint). The last three defendants were added "to comply with Alabama law governing declaratory judgment actions." *Id.* ¶¶ 5-7.

[2] Doc. no. 12.

[3] Doc. no. 17.

[4] Doc. no. 19.

court concludes the motion is due to be denied.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b) permits a party to move to dismiss a complaint for, among other reasons, "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). This rule must be read together with Rule 8(a), which requires that a pleading contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While that pleading standard does not require "detailed factual allegations," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 550 (2007), it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). As the Supreme Court stated in *Iqbal*:

> A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." [*Twombly*, 550 U.S., at 555]. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id*., at 557.
>
> To survive a motion to dismiss founded upon Federal Rule of Civil Procedure 12(b)(6), [for failure to state a claim upon which relief can be granted], a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." *Id*., at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*. Where a complaint pleads facts that are "merely

consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).

Two working principles underlie our decision in *Twombly*. *First*, the tenet that a court must accept as true all of the allegations contained in a complaint is *inapplicable to legal conclusions*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.*, at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. *Second*, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.*, at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d, at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not "show[n]" — "that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. *When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.*

*Iqbal*, 556 U.S. at 678-79 (emphasis added).

## II.  RELEVANT ALLEGATIONS OF PLAINTIFF'S COMPLAINT

M & N was formed in 2003 by Brian McCord and Brian Nelson for the purpose of owning and operating a rock quarry. The land M & N was planning to use for the quarry was a 160-acre parcel already owned by Nelson and located outside the Gurley town limits.[5] M & N purchased the land from Nelson and obtained permits from the Alabama Department of Environmental Management ("ADEM") to operate a quarry on the land.[6] It also obtained business licenses from Madison County and the State of Alabama.[7] As the property was located outside the Gurley town limits, M & N was not originally required to obtain a license or permit from the Town.

Sometime in 2003, some of Gurley's residents began to oppose the opening of the quarry. The residents proposed that the Town annex the property M & N intended to use for the quarry, so that the Town could then regulate the quarry's operation.[8] The Town initially declined to annex the land, but the issue was put to a vote on April 13, 2004, and as a result of that vote, M & N's property was involuntarily incorporated into the Town of Gurley.[9]

M & N applied for a business license from the Town, but the Town Clerk's office informed M & N that it had "'been instructed not to issue a business license for

---

[5] Complaint ¶ 8.
[6] *Id.* ¶¶ 9-10.
[7] *Id.* ¶ 11.
[8] *Id.* ¶ 12.
[9] *Id.* ¶¶ 12-13.

4

M & N.'"[10]  Less than two weeks later, "the Town imposed a moratorium, specific to the M & N property only, on accepting any application for a permit, license, zoning request, or any similar request that could be made by M & N to the Gurley government."[11]  Additionally, in July of 2004, the Town created a Board of Adjustment for the purpose of hearing applications for variances from zoning decisions.[12]  Six of the eight members of the newly-created Board of Adjustment were individuals known to be against the development of the quarry.[13]  Citizens who had made public statements against the quarry also were elected to the offices of Mayor and City Council.[14]  The newly elected Town government reassigned the responsibility for processing business licenses to an individual who was known to be against the quarry.[15]  The newly elected Mayor appointed to the Town's Planning Commission five new members who were opposed to the quarry.[16]  The Planning Commission subsequently recommended that the property M & N intended for the quarry be re-zoned for agricultural use, and that recommendation was adopted by the

---

[10] *Id.* ¶¶ 14-15.
[11] Complaint ¶ 16.
[12] *Id.* ¶¶ 17-18.
[13] *Id.* ¶ 19.
[14] *Id.* ¶ 20.
[15] *Id.* ¶ 21.
[16] *Id.* ¶ 22.

City Council.[17]

After M & N received its ADEM permits and State and County licenses, but before the Town annexed M & N's property, defendant Vulcan Materials Company ("Vulcan Materials") and certain of its subsidiaries became aware of M & N's intent to open the quarry.[18]  Additionally, prior to the annexation, Vulcan Construction Materials, LP ("Vulcan Construction") paid M & N for the right to explore the property for mineral deposits and other characteristics of potential value, so it could determine if it wanted to purchase the property from M & N.[19]  After conductig that exploration, Vulcan Construction obtained an option to purchase the property from M & N for an amount that apparently was specified in the parties' agreement, but is *not* specified in plaintiff's complaint.[20]  After the new Mayor, City Council, and Planning Commission were elected, and after the new Board of Adjustment was created, Vulcan Construction "substantially reduced" the purchase price it was willing to pay M & N due to what it referred to as "'this Gurley situation.'"[21]  The complaint does not specify how much Vulcan Construction's new offer was, or how much it was reduced from the original purchase price.  Vulcan Construction also

---

[17] Complaint ¶ 23.
[18] *Id.* ¶ 24.
[19] *Id.* ¶ 25.
[20] *Id.* ¶ 26.
[21] *Id.* ¶ 27.

offered a Royalty Agreement to M & N, but because the quarry has never been allowed to operate on the property, Vulcan Construction has not paid M & N any money under the Royalty Agreement.[22]

M & N felt that it was "[o]ut of viable options, facing a town that was prepared to do anything necessary to stop its lawful business, and still owing money on promissory notes for the quarry land."[23]  Consequently, it "had no reasonable alternative other than to accept an offer to purchase from Vulcan[ Construction]'s affiliate, Vulcan Lands, at an amount far less than the amount Vulcan [Construction] agreed to pay prior to 'the Gurley situation.'"[24]

After Vulcan Lands purchased the property from M & N, it applied for a business license from the Town, but the application was denied.[25]  M & N retained a royalty interest in the property, but it has never received any royalty payments from Vulcan Lands, or from any other Vulcan entity, because Vulcan Lands has never been permitted to operate a quarry on the property it purchased from M & N.[26]  Even so, the Town has permitted certain Vulcan entities to open and operate a quarry on another parcel of land that is contiguous to the land Vulcan Lands purchased from M

---

[22] *Id.* ¶ 28.
[23] Complaint ¶ 29 (alteration supplied).
[24] *Id.* (alterations supplied).
[25] *Id.* ¶ 30.
[26] *Id.* ¶¶ 30, 32.

& N.[27]  The Town has never compensated, or offered to compensate, M & N for "annexing the property into Gurley or regulating its lawful business out of existence."[28]

Even though the complaint in this case does not specify how much the purchase price of M & N's land decreased after various members of the Gurley local government took actions to ensure that the quarry could not open, an opinion of the Alabama Supreme Court in a state law inverse condemnation suit M & N brought against the Town sheds some light on that matter.  In addressing a petition, filed by the Town and its Mayor, for a writ of mandamus directing the trial court to grant their motions for summary judgment on M & N's claims against them, the Alabama Supreme Court stated that Vulcan Lands originally acquired an option to purchase the property from M & N for $3.75 million on July 12, 2004, but that it never exercised that option because M & N could not obtain a business license from the Town.  *Ex parte Simpson,* 36 So.3d 15, 20 (Ala. 2009).  "Nevertheless, on November 23, 2004, M & N sold the property to Vulcan Lands."  *Id.*  "According to M & N, the consideration for the sale of the property was actually $1 million, plus the royalty

---

[27] *Id.* ¶ 32.
[28] *Id.* ¶ 31.

payments and obligations due under the agreement." *Id.* at 21.[29]

### III. DISCUSSION

M & N's unconstitutional taking claim is asserted under the Fifth Amendment to the United States Constitution,[30] made applicable to the various states through the Fourteenth Amendment.[31] The United States Supreme Court defined the contours of a Fifth Amendment taking claim in *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528

---

[29] It is permissible for the court to consider the facts set forth in the Alabama Supreme Court's opinion without converting the Town's motion to dismiss into a motion for summary judgment. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."). Documents from prior judicial proceedings can be considered without converting a motion to dismiss into one for summary judgment, because such documents are "public records that [are] 'not subject to reasonable dispute' because they [are] 'capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned.'" *Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010) (quoting Fed. R. Evid. 201(b); other citations omitted) (alterations supplied).

[30] The Fifth Amendment to the United States Constitution provides that:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grant Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; *nor shall private property be taken for public use*, *without just compensation*.

U.S. Const., amend. V (1791) (emphasis supplied to the "taking clause").

[31] The "taking clause" of the Fifth Amendment has long been held applicable to the states. The Supreme Court said in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978), that "of course" the taking clause "is made applicable to the States through the Fourteenth Amendment." *Id.* at 122 (citing *Chicago, Burlington & Quincy Railroad Co. v. Chicago*, 166 U.S. 226, 238-39 (1897)).

(2005). The following quote from that opinion is lengthy, but a comprehensive understanding of the text is necessary because the parties dispute the proper scope of a takings claim. The Supreme Court's opinion in *Lingle* said that:

> The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth, *see Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 17 S. Ct. 581, 41 L. Ed. 979 (1897), provides that private property shall not "be taken for public use, without just compensation." As its text makes plain, the Takings Clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 314, 107 S. Ct. 2378, 96 L. Ed.2d 250 (1987). In other words, it "is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *Id.*, at 315, 107 S. Ct. 2378 (emphasis in original). While scholars have offered various justifications for this regime, we have emphasized its role in "bar[ring] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S. Ct. 1563, 4 L. Ed. 2d 1554 (1960); *see also Monongahela Nav. Co. v. United States*, 148 U.S. 312, 325, 13 S. Ct. 622, 37 L. Ed. 463 (1893).
>
> The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property. *See, e.g., United States v. Pewee Coal Co.*, 341 U.S. 114, 71 S. Ct. 670, 95 L. Ed. 809 (1951) (Government's seizure and operation of a coal mine to prevent a national strike of coal miners effected a taking); *United States v. General Motors Corp.*, 323 U.S. 373, 65 S. Ct. 357, 89 L. Ed. 311 (1945) (Government's occupation of private warehouse effected a taking). Indeed, until the Court's watershed decision in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S. Ct. 158, 67 L. Ed. 322 (1922), "it was generally thought that the Takings Clause reached only a 'direct appropriation' of property, or the functional equivalent of a 'practical

ouster of [the owner's] possession.'" *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992) (citations omitted and emphasis added; brackets in original); *see also id.*, at 1028, n. 15, 112 S. Ct. 2886 ("[E]arly constitutional theorists did not believe the Takings Clause embraced regulations of property at all").

Beginning with *Mahon*, however, the Court recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster — and that such "regulatory takings" may be compensable under the Fifth Amendment. In Justice Holmes' storied but cryptic formulation, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." 260 U.S., at 415, 43 S. Ct. 158. The rub, of course, has been — and remains — how to discern how far is "too far." In answering that question, we must remain cognizant that "government regulation — by definition — involves the adjustment of rights for the public good," *Andrus v. Allard*, 444 U.S. 51, 65, 100 S. Ct. 318, 62 L. Ed. 2d 210 (1979), and that "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law," *Mahon, supra*, at 413, 43 S. Ct. 158.

Our precedents stake out two categories of regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes. First, where government requires an owner to suffer a permanent physical invasion of her property — however minor — it must provide just compensation. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982) (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking). A second categorical rule applies to regulations that completely deprive an owner of "all economically beneficial us[e]" of her property. *Lucas*, 505 U.S., at 1019, 112 S. Ct. 2886 (emphasis in original). We held in *Lucas* that the government must pay just compensation for such "total regulatory takings," except to the extent that "background principles of nuisance and property law" independently restrict the owner's intended use of the

11

> property. *Id.*, at 1026-1032, 112 S. Ct. 2886.
>
> Outside these two relatively narrow categories (and the special context of land-use exactions discussed below, *see infra*, at 2086-2087), regulatory takings challenges are governed by the standards set forth in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978). The Court in *Penn Central* acknowledged that it had hitherto been "unable to develop any 'set formula'" for evaluating regulatory takings claims, but identified "several factors that have particular significance." *Id.*, at 124, 98 S. Ct. 2646. Primary among those factors are "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." *Ibid.* In addition, the "character of the governmental action" — for instance whether it amounts to a physical invasion or instead merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good" — may be relevant in discerning whether a taking has occurred. *Ibid.* The *Penn Central* factors — though each has given rise to vexing subsidiary questions — have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or *Lucas* rules. *See, e.g., Palazzolo v. Rhode Island*, 533 U.S. 606, 617-618, 121 S. Ct. 2448, 150 L. Ed. 2d 592 (2001); *id.*, at 632-634, 121 S. Ct. 2448 (O'CONNOR, J., concurring).

*Lingle*, 544 U.S. at 536-39 (alterations and emphasis in original).

It is undisputed that M & N's claim is for a "regulatory taking," not a "physical taking." The parties disagree, however, about the scope of the regulatory taking claim. The Town argues that the claim must be dismissed because M & N failed to "plausibly allege" that the Town's actions have deprived M & N of all beneficial use

of its property, thus rendering the property worthless.[32]  It is true that no such allegations appear in M & N's complaint; indeed, judicially noticeable documents from a related state court case indicate that, even after all of the Town's regulatory impediments were implemented, M & N still was able to sell its property for $1 million, and it retained a right to royalty payments.  Thus, it cannot be reasonably deduced from any of the allegations of M & N's complaint that M & N was deprived of *all* economically beneficial or productive use of its property, or that the property was rendered essentially worthless.  *See Agripost, Inc. v. Miami-Dade County*, 195 F.3d 1225, 1231 (11th Cir. 1999); *Serpenfoot v. Rome City Commission,* 322 F. App'x 801, 805 (11th Cir. 2009).

That would be the end of the matter, *if* demonstrating the loss of all economically beneficial use of property were the *only* way to demonstrate an unconstitutional regulatory taking.  It is not.  As the *Lingle* opinion makes clear, loss of all economically beneficial use is but one type of a *per se* (or, as the Town calls it, a "categorical") regulatory taking claim.  Another way of supporting a regulatory taking claim is by evaluating the factors set forth in the Supreme Court's *Penn Central* opinion:  *i.e.,* the economic impact of the regulation on plaintiff; the extent

---

[32] Doc. no. 13 ("Brief of Town of Gurley, Alabama in Support of Motion to Dismiss Federal Takings Claim"), at 7.

to which the regulation has interfered with distinct investment-backed expectations; and, the character of the governmental action. *See Penn Central,* 438 U.S. at 124. While the factual allegations of plaintiff's complaint could certainly be more detailed, they are not inconsistent with a *Penn Central* regulatory takings claim.[33]

## IV. CONCLUSION AND ORDER

For all of the foregoing reasons, the Town of Gurley's motion to dismiss plaintiff's unconstitutional takings claim (Count One ) is DENIED.[34]

**DONE** and **ORDERED** this 10th day of June, 2014.

_____
United States District Judge

---

[33] The court disagrees with the Town's argument that demonstrating the loss of all economically beneficial use of the property is a "fundamental requirement[] of *any* regulatory takings claim. Doc. no. 19 ("Reply of Town of Gurley, Alabama in Support of Motion to Dismiss Federal Takings Claim"), at 1-2. The Eleventh Circuit admittedly framed the analysis in *Serpenfoot* and *Agripost* in terms that, when read alone, seem to support the Town's argument. *See Serpenfoot,* 322 F. App'x at 805-06 ("In order to state a claim for a regulatory taking, a plaintiff must allege . . . that the government action denied her 'all economically beneficial or productive use of [her] property.'") (quoting *Agripost*, 195 F.3d at 1231) (alteration in original, ellipses supplied); *Agripost*, 195 F.3d at 1231 ("First, the property owner must allege that the governmental action . . . has 'denie[d] all economically beneficial or productive use of' his property. . . . . In other words, the governmental action must have made the property worthless.") (quoting *Lucas*, 505 U.S. at 1015). However, the *Agripost* decision predates the Supreme Court's 2005 opinion in *Lingle*, and the *Serpenfoot* decision is unpublished and, therefore, only persuasive authority. *Lingle* makes it clear that a plaintiff can support a regulatory takings without alleging that its property has been rendered valueless.

[34] The Town already filed an answer and amended answer to plaintiff's complaint, denying the allegations of Count One. *See* doc. no. 14 (Answer by Town of Gurley); doc. no. 20 (Amended Answer by Town of Gurley).